Strafford,
No. 5293.

NORMAND P. LIBERTY *v.* BOURQUE SHOE CO. *& a.*

Argued February 2, 1965.
Decided February 26, 1965.

*Burns, Bryant & Hinchey (Mr. Donald R. Bryant* orally), for the plaintiff.

*Booth, Wadleigh, Langdell, Starr & Peters* and *Robert L. Chiesa (Mr. Chiesa* orally), for the defendants.

DUNCAN, J. The plaintiff Liberty seeks to recover damages for breach by the defendant Bourque Shoe Company, Inc. of its undertaking to pay him "contingent compensation," as provided in a written agreement between the parties under date of January 28, 1955, effective as of June 1, 1954. The contract was terminated by agreement of the parties, dated October 22, 1956, under which the plaintiff was thereafter employed at a fixed weekly salary and "special expenses of One Hundred Dollars per week." The counterclaim as filed was for payments made to the plaintiff following January 28, 1955, but as submitted to the jury was restricted to payments made after October 22, 1956. The defendant Harmon Shoes, Inc. is a party by reason of its assumption of the liabilities of the defendant Bourque Shoe Co., Inc.

The plaintiff was first employed by Bourque Shoe Company, Inc. as sales manager and stylist, and to assist in factory supervision, for a period of two years from June 1, 1952. A written contract between the parties provided for compensation of $250 per week, a "general expense allowance" of "up to $50.00 per week," and in addition a credit of an amount called "contingent compensation" equal to one third of the annual net profits of the company in excess of $30,000 after taxes, during the period of employment. This amount was to be "payable . . . in shares of common stock [of the company] at their book value as at the end of the year for which the net profit is determined." During the life of this agreement the net profits after taxes did not exceed $30,000, and hence no "contingent compensation" was paid.

The contract of January 28, 1955 upon which this action is based was in many respects identical with the contract of 1952. It differed among other respects in that the "contingent compensation" was to be an amount equal to one third of the "net profits from operations," after taxes, and in its provision that except for so much thereof as would be required to reimburse Liberty for additional income taxes assessed against him on account of such compensation, the contingent compensation instead of being "payable . . . in common stock," was to "be used [by him] to buy shares of common stock" of the company.

Pertinent parts of the contract, which was for a five-year term subject to the right of either party to terminate upon six months notice, were as follows:

"2. Liberty's compensation shall be $250.00 per week and he shall have up to $50.00 per week as a general expense allowance, and in addition he shall, subject to paragraph 4 hereof, be credited with an amount (hereinafter called 'contingent compensation') equal to one third of the net profits from operations of Bourque, after taxes, during the period of his employment hereunder, determined as, and less the deductions, herein provided. . . .

"4. . . . (b). Net profits from operations shall be determined by the company's accountants in accordance with the usual accounting practices of Bourque, and the contingent compensation payable hereunder for the year or period in question shall be deemed an expense of doing business. If the employment, by death or otherwise, shall terminate other than at the end of the fiscal year of Bourque, the net profit shall be determined for the entire fiscal year, and apportioned rateably to the portion

of the year during which the employment shall have continued.

"(c). Until such time as Liberty shall become the owner of one third of the common stock of Bourque, all amounts of contingent compensation hereunder which are in excess of an amount equal to Liberty's state and federal income taxes thereon, as determined hereunder, shall, unless in any case the parties otherwise agree, be used by Liberty to buy shares of common stock of Bourque at their value for purposes of this contract. The value for purposes of this contract of such shares shall be their book value at the end of the fiscal year for which the net profits from operations are determined, except that machinery and equipment shall be taken at $75,000 plus the then book value of any additions thereto after January 1, 1955. No fractional shares shall be purchased and purchases shall be of the nearest number of whole shares. For purposes hereof the amount of Liberty's federal and state income taxes on his contingent compensation for any year or period shall be computed from Liberty's returns and in each instance shall be the difference between the total tax shown on the return and the tax which would have been payable by Liberty in the absence of any contingent compensation hereunder."

No "contingent compensation" was ever credited to the plaintiff under this agreement although he testified that it was promised to him from time to time. In October 1956 he was called to Portland, Maine, by the president of Bourque who was dissatisfied with the operations of the company. As a result of this conference, a new agreement was prepared by the plaintiff himself, and executed by the parties under date of October 22, 1956. This provided without more for a salary at a weekly rate of $225 with "special" weekly expenses of $100, for which the plaintiff should "devote his efforts in selling." The introductory provision of this agreement read as follows: "This agreement supercedes any prior agreements between Bourque Shoe Co., Inc. and Normand P. Liberty."

The parties were in disagreement as to the purpose and effect of this introductory provision. According to the plaintiff, the president of the company Berkowitz, sought his agreement to a provision which would terminate all liability of the company under the contract of 1955, but the plaintiff refused. Berkowitz testified that the purpose of the new agreement was to "start with a clean slate," with no obligations remaining under the 1955 contract. The plaintiff testified to the contrary, that he

was assured that his "contingent compensation" would be taken care of later.

Subject to the defendants' exceptions, the Trial Court denied their motion for a nonsuit and directed verdict based upon the contract of October 22, 1956, and their request for an instruction to the jury that the contract of October 22, 1956 "was effective to eliminate any claim for contingent compensation" under the 1955 contract. Instead, the Court instructed the jury in accordance with an alternative request submitted by the defendants as follows: "If you find that it was the intention of the parties at the time they executed the contract of October 22, 1956, to strike the slate clean and to eliminate any claims for contingent compensation that may have previously accrued, then in such event you must decide against the plaintiff in his claims for contingent compensation."

In support of these exceptions, the defendants contend that the agreement of October 22, 1956 was not ambiguous because the word "supercedes" means "annuls" or "sets aside," so that its legal effect was to "wipe out any claims that might have existed under the prior agreement."

It is plain that the 1956 agreement was intended to take the place of the 1955 agreement in governing the relation of the parties as to future services, and compensation therefor. It expressly stated that it "supercedes any prior agreements." This did not necessarily mean that it also superseded any "liabilities" which may have accrued under the prior agreement. If the new agreement was intended to discharge or "annul" existing liabilities, the parties might have been expected to so state.

In our opinion the meaning of the 1956 agreement was not so far free from doubt as to preclude submission of the issue of its meaning to the jury for decision in the light of the conflicting testimony. The verdict for the plaintiff made it plain that the jury adopted the plaintiff's interpretation of the 1956 agreement.

The defendants further argue that a verdict should have been directed in their favor on a basis of the 1955 agreement because there was no evidence upon which the jury could find it liable. In accordance with their request for instructions, the Court charged the jury that "there is no evidence that Mr. Liberty ever paid any extra income taxes by reason of any claimed contingent compensation under the agreement in question." The defendants argue that under this ruling "no cash by way of

contingent compensation was payable" to Liberty, and further that since no determination was ever made of any amount due him for taxes, no credit to be utilized for payment for stock could be determined and thus there was no breach on their part. Finally they argue that because there was no evidence of the market value of the stock at any time, the amount of the plaintiff's tax liability upon any contingent compensation could not be determined, and hence the jury could not properly assess damages, even if liability could be found.

These contentions fall short of establishing the defendants' right to a directed verdict. The contract provided that the plaintiff was entitled to contingent compensation "payable . . . for each year or lesser period," which was to "be deemed an expense of doing business." If the employment terminated "other than at the end of the fiscal year of Bourque," the net profit for the fiscal year was to be apportioned. The compensation was to be used to buy stock the value of which was to be the "book value at the end of the fiscal year for which the net profits from operations are determined." These and other provisions make it plain that the agreement contemplated that the amount of plaintiff's contingent compensation should be credited to him at the end of the defendant Bourque's fiscal year.

Since there was evidence from which it could be found that the company had a profit from operations during one or more of the fiscal years in question, we think it plain that the evidence presented issues for the jury. The plaintiff testified that he inquired about his contingent compensation in 1955 and again in 1956, only to be put off by the company. According to the contract, the "net profits from operations" were to be "determined by the company's accountants." Since there was evidence that there were net profits from operations for the fiscal years ending May 31, 1955 and May 31, 1956 and that the company failed to credit the plaintiff with any contingent compensation when this was determined, it could be found to have breached its agreement.

The evidence did not compel a finding that the plaintiff waived his right to receive such a credit. The absence of evidence of the market value of the stock was not a fatal defect. The contract expressly provided that the stock should be purchased at its "value for purposes of this contract." It continued: "The value for purposes of this contract of such shares shall be their book value at the end of the fiscal year for which the net profits from

operations are determined, except that machinery and equipment shall be taken at $75,000 plus the then book value of any additions thereto after January 1, 1955. No fractional shares shall be purchased and purchases shall be of the nearest number of whole shares."

The evidence was that out of one thousand shares of authorized common stock 560 shares had been issued to the president of the company and his son. The difficulties of placing a market value upon such stock were obvious. It was competent for the parties to agree upon a method of determining value for purposes of the contract, and this they undertook to do. The import of the agreement that book value should be controlling "for purposes of this contract," is that it should control not only to determine the number of shares which the plaintiff should buy, but also to fix his damages in the event of breach.

Where a contract provides for a "forfeiture" in the event of breach, "(t)he difficulty in ascertaining the amount of the plaintiff's damage in case the contract is broken tends to prove that [the forfeiture] is liquidated damages. . . ." *Clark* v. *Britton*, 76 N. H. 64, 65. Agreements as to the value of property to which a contract relates are enforceable "even though in some instances the agreement will determine the amount of the recovery in an action for breach of contract." 5 Corbin on Contracts, *s.* 1069, *p.* 391. See also, Williston on Contracts (3d ed. Jaeger) *s.* 787; *Fadden* v. *Insurance Co.*, 77 N. H. 392.

The defendants' exceptions to the denial of their motions for nonsuit and directed verdicts, and to denial of their request for an instruction that the contract of October 22, 1956 eliminated any claim for contingent compensation are overruled.

In submitting the case to the jury, the Court gave certain instructions requested by the plaintiff to which the defendants excepted, and also denied certain of the defendants' requests, subject to exception. The jury was told in substance that if it found the plaintiff entitled to recover, it should determine the amounts to which he was entitled under the contract, and determine damages as of May 31, 1955 and May 31, 1956 "for the profits as you ascertain them, if any, due from operations from fiscal years of the defendant from the particular dates." The jury was also told that "any later loss in value of the stock of the defendant subsequent to May 31, 1956 shall not be considered by you." In these instructions we see no error.

A principal witness for the plaintiff was a Mr. Kathan, a former bookkeeper for the defendant who undertook, subject to the

defendants' exception, to give the jury his computation of the contingent compensation due the plaintiff, using the company's tax returns as a determination "by the company's accountants" of the net profits from operations, as provided by the contract. In making his computation the witness adjusted upward the figures for net income shown by the tax returns, to offset adjustments made in closing inventories for the two fiscal years in question. With respect to the year ending in May 1955 these adjustments were of minor significance, and the witness concluded that a credit of $2,069.52 had been due the plaintiff for that year.

Upon cross-examination of the plaintiff however, it was disclosed that "net operating profit" for the same year as shown by the company profit-and-loss statement was $3,161.50, or $580.01 after taxes. These figures reflected income of $9,906.23 from "gain on sale of fixed assets," which was more than offset by expenses for "donations" and "life insurance" not carried into the income tax return. The plaintiff conceded that gain from the sale of fixed assets would not be a part of "net profits from operations" within the meaning of the plaintiff's contract; and it appeared that even if it were, the amount of one third of the net operating profit as shown by the profit-and-loss statement would have been insufficient to permit the purchase of any stock by the plaintiff at its then book value.

With respect to the fiscal year ending May 31, 1956, the witness Kathan adjusted the net income shown by the company's tax return by adding a net increase of $35,090.85 attributed to the adjustments in closing inventory for that year. Recomputing the net income after taxes to reflect this net increase, the witness computed one third of the operating profits after taxes at $14,493.53. Significantly this was the precise amount of the verdict returned by the jury.

Opposed to this evidence as to the year ending May 31, 1956 was evidence offered by the defendant on cross-examination of the plaintiff that the net operating profit as shown by the profit-and-loss statement for that year was $27,623.93, and $9,818.77 after taxes. No attempt was made by either party to show the effect of adjusting these figures to reflect the inventory write-off. The defense against any claim that the plaintiff was entitled to credit for one third of $9,818.77 was the defendants' contention that he was not entitled to cash in an amount equal to his increased tax because he never included any contingent compensation in any tax return; and that he was not entitled to recover

damages for the value of stock because there was no evidence of its market value as of May 31, 1956 or any other time, and because there was evidence that the stock had become valueless by 1958, the year in which the plaintiff's employment was terminated.

On this state of the evidence, the defendant excepted to denial of its request that the jury be instructed that "the determination of net profits under the contract was not the same as determination of net profits for purposes of federal income taxes and you cannot take the federal income tax returns of the company for the years involved as the measure of net profits pursuant to the agreement." The defendant likewise excepted to denial of its request for an instruction that "no amount of contingent compensation became due to Mr. Liberty with reference to the fiscal year ending May 1955."

Since the verdict returned by the jury was obviously based upon the testimony of the witness Kathan as to contingent compensation for the year ending May 1956, it is apparent that the jury itself found the defendant under no liability for the preceding year. However it could be found upon competent evidence that the plaintiff was entitled to credit for one third of $580.01, representing net profits from operations for the year ending May 1955. While this amount was insufficient to permit immediate purchase of stock, the credit could have been combined with any credit becoming due in May 1956, and thus used for the purchase of stock. We therefore conclude that an instruction that no compensation became due for the year ending in May 1955 was properly denied.

In addition to excepting to testimony on the part of Kathan based upon the income tax returns, the defendant excepted to receipt in evidence of a written summary of his computation from the income tax returns showing "compensation due" the plaintiff in the amounts representing a third of the net operating profits for the years in question as testified to by the witness.

The purpose of agreements of the sort here involved "is to give the executive a share in earnings produced by his own efforts" and "any intention to give him a share in capital gains or other income not derived from the normal operation of the business must be stated in the most explicit terms." Washington, "The Corporation Executive and His Profit-Sharing Contract," 50 Yale L. J. 35, 52. We think it reasonably plain in this case that the parties intended that "net profits from opera-

tions" should be determined with reference to the operations of the particular year in question, and without regard to non-operating income or expense, which might nevertheless affect net income for income tax purposes. We therefore conclude that the computations by the witness Kathan based upon net income for federal tax purposes were erroneously received in evidence, and that the defendants' request for an instruction that the tax returns should not be used as the measure of net profits was erroneously denied. Since these errors were obviously prejudicial, the verdict must be set aside and a new trial ordered.

On the evidence at the first trial, the profit-and-loss statement received in evidence could be found to answer the call of the contract that the profits from operations "be determined by the company's accountants in accordance with the usual accounting practices of Bourque." See *Charlton* v. *Library Bureau*, 260 Mass. 1. Whether particular items such as charitable donations or the cost of life insurance were properly included in operating expenses "in accordance with [such] practices . . ." is a question of fact.

Since a special verdict was returned for the plaintiff on the defendants' counterclaim, and no errors appear with respect thereto, there should be judgment in his favor on the counterclaim. Similarly no errors appear with respect to submission of the issue of whether the contract of October 22, 1956 operated to discharge liability under the prior contract. The verdict for the plaintiff implies a finding that it did not, and no reason is now apparent for retrial of that issue.

While the amount of the verdict in the assumpsit action suggests a finding of no liability for the fiscal year ending in May 1955, the fact that the verdict was general prevents categorical determination that this is so. Hence the issue of liability for contingent compensation for both fiscal years remains open for retrial. However in the absence of evidence that one third of the net operating profit after taxes was sufficient to permit the purchase of stock, any issue as to the year ending May 1955 should be withdrawn from the jury.

> *Judgment for the plaintiff on defendants' counterclaim; in the action of assumpsit, new trial.*

BLANDIN, J., did not sit; the others concurred.